**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**FRANKIE BAERGA-CASTRO, et al.,**

**Plaintiffs,**

**v.**                                                   **Civil No. 08-1014 (GAG/JA)**

**WYETH PHARMACEUTICALS,**

**Defendant.**

## OPINION AND ORDER

Plaintiffs Frankie Baerga-Castro and Carmen N. Mercado brought this action against Baerga's employer Wyeth Pharmaceuticals ("Wyeth") claiming discrimination, harassment, and retaliation due to Baerga's military status pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4311 et seq. (Docket No. 1). Baerga also claims age-based discrimination and harassment pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., and Puerto Rico Law 100 ("Law 100"), P.R. Laws Ann., tit. 29, §§ 146 et seq. (Docket No. 1). Finally, Baerga claims that he was the victim of retaliation in violation of the ADEA and Puerto Rico Law 115 ("Law 115"), P.R. Laws Ann., tit. 29, §§ 194 et seq. (Docket No. 1). Co-plaintiff Mercado claims damages for mental suffering pursuant to Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann., tit. 32, § 5141. (Docket No. 1).

Defendant moved for summary judgment pursuant to Fed.R.Civ.P. 56. (Docket No. 35). In its motion for summary judgment defendant argues: (a) that Baerga's hostile work environment claim under USERRA is not cognizable; (b) that Baerga has not been subjected to harassment, discrimination, or retaliation because of his military status; (c) that Baerga's claims under the ADEA are time-barred, in whole or in part, because he failed to exhaust administrative remedies within the applicable 300-day term; (d) that Baerga has not been subjected to harassment, discrimination, or retaliation because of his age; and (e) that co-plaintiff Mercado's cause of action under Article 1802 of the Puerto Rico Civil Code is time-barred by the applicable statute of limitations. After reviewing

**Civil No. 08-1014 (GAG/JA)**

the pleadings, the court **GRANTS** defendant's motion for summary judgment.  (Docket No. 35).

      **I.    Standard of Review**

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325.  The nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party (here, the plaintiff) and give that party the benefit of any and all reasonable inferences. Id. at 255.  Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id.  Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir.2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir.2003)).

Local Rule 56(b) requires a party moving for summary judgment to file "a separate, short, and, concise statement of material facts [. . .] as to which the moving party contends there is no genuine issue of material fact to be tried." D.P.R. L.R. 56(b).  The movant must support each statement with a citation to the record. Id.  The non-movant has a corresponding obligation to

**Civil No. 08-1014 (GAG/JA)**

submit with its opposition "a separate, short, and concise statement of material facts" in which it admits, denies, or qualifies the moving party's facts with reference to each numbered paragraph of the moving party's statement. See, D.P.R. L.R. 56(c). Additionally, the non-moving party must support each denial or qualification with a record citation. Id.

While a party's failure to comply with these rules does not automatically warrant the granting or denial of summary judgment, "the parties ignore [the rules] at their peril." Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000). The First Circuit has repeatedly held that the district court is justified in deeming one party's submitted uncontested facts to be admitted when the other party fails to file an opposition in compliance with Local Rule 56. See, e.g., Fontanez-Nunez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006); Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 4 (1st Cir. 2003); Corrada-Betances v. Sea-Land Serv., Inc., 248 F.3d 40, 43-44 (1st Cir. 2001); see also, D.P.R. L.R. 56(e) (declaring that facts not properly controverted "shall be deemed admitted").

In this case, Wyeth complied with Local Rule 56(b) by filing a separate statement of uncontested facts with proper references to the record. If plaintiffs wished to controvert any of the facts submitted by defendant, they should have denied or qualified such facts by reference to the numbered paragraphs of the opposing party's statement of material facts and each denial or qualification should have been supported by a record citation as required by subsection (c) of Local Rule 56. Plaintiffs failed, in the most part, to adequately support their proposed statement of uncontested facts.[1] This court, therefore, shall deem defendant's uncontested facts (those that were not adequately contested by plaintiffs) admitted.

---

[1] The court, at Docket No. 78, held that Baerga's affidavit, which was the primary source of support for plaintiffs' statement of uncontested facts, could not be used to create issues of material fact in order to resist summary judgment. Therefore, plaintiffs' statement of uncontested facts is not well supported as to those facts that were only sustained by reference to the affidavit. All other facts that have appropriate citations to the record are well-supported.

3

Civil No. 08-1014 (GAG/JA)

## II.    Relevant Factual Background[2]

Plaintiff Baerga was born on December 4, 1957.  In 1975, he enrolled in the armed forces. On May 19, 1986, he started working for Wyeth, at which point he was still a member of the armed forces.  Baerga has knowledge of Wyeth's anti-discrimination, anti-harassment, and anti-retaliation policies as he has signed acknowledgments of receipt of these policies on several occasions.

Currently, Baerga works in Wyeth's Maintenance Department.  Baerga held the position of "Supervisor - Engineering/Maintenance," at a grade level of 46.  On March 1, 2005, Baerga's position was renamed as "Supervisor II - Plant Engineering/Maintenance."  This change took place as a result of a company-wide reorganization in which the job titles of all the positions in the company were changed and the job descriptions revised.  Despite the change in the title of the position, Baerga's duties were the same until he took military leave and left for Kosovo.

While working for Wyeth, Baerga had been under active military duty for a period longer than two weeks on two occasions.  The first time was from October 1, 2002 until September 8, 2003, when he went on active duty to Guantanamo Bay, Cuba.  Upon completion of his military duty, Baerga returned to work at Wyeth and continued holding the same position he had prior to his departure.  At that time, Baerga was already over 40 years old.  The second time he went on military leave for a period longer than two weeks was from September 18, 2005 until August 7, 2006, when Baerga went on active duty to Kosovo.  He reported back to work on September 25, 2006.  Baerga stated in his deposition that, when he returned back to work in September 2006, his duties and tasks had increased.  However, he also admits in his deposition that his current duties and tasks fall within the purview of the job description of "Supervisor II - Plan Engineering and Maintenance" that he reviewed at his deposition.

Roberto Torres worked at Wyeth from January 25, 2005 until February 1, 2008.  From his recruitment until March 6, 2006, Torres held the position of Director of the Engineering and

_____

[2] The facts that appear below are based on the uncontroverted facts adequately supported by the record.

**Civil No. 08-1014 (GAG/JA)**

1  Maintenance Departments.  As a result of a reorganization, the Maintenance and Engineering
2  Departments were separated and, for that reason, from March 6, 2006 until his last day at Wyeth,
3  Torres held the position of Director of the Maintenance Department.  The position of Director of the
4  Engineering Department was assigned to another employee.  As a result of a reduction in force and
5  another reorganization, his position was finally eliminated and his employment relationship with
6  Wyeth ceased effective February 1, 2008.  Since the very first moment that Torres was recruited, he
7  was in charge of undertaking a major reorganization in the Engineering and Maintenance
8  Departments of Wyeth as a result of a "warning letter" issued by the Food and Drug Administration
9  ("FDA").

10  Before Baerga's return from his last military leave in 2006, the Engineering and Maintenance
11  Departments at Wyeth were restructured in response to business needs and to align the organization
12  to the "Shop Floor Excellence Program."  The "Shop Floor Excellence Program" is part of Wyeth's
13  "Operational Excellence Initiative," which is aimed at obtaining more focus per product and
14  assigning resources evenly throughout shifts.  This initiative started in 2004, giving priority to
15  production units.  In 2006, functional units, such as Maintenance, Engineering, Technology, and
16  Quality, began their transformation and alignment to this concept.  As a result, shift changes took
17  place in all of these areas.  For example, in September 2006, Harrison Maldonado, a supervisor who
18  was not a member of the military and was under 40 years of age, was transferred to the second shift.
19  Also, the Maintenance Department's "Machine Shop," which had been eliminated from the second
20  work shift because it had become unnecessary, had to be implemented again for the second shift as
21  part of the reorganization.

22  As a result of the restructuring, a second and third shift were also implemented in the
23  Manufacturing and Packaging operations.  To ensure the reliability of Wyeth's systems and products,
24  resources were assigned to support maintenance activities during those shifts.   Also, the
25  Computerized Maintenance Management System ("CMMS"), which controls the corrective and
26  preventive maintenance at the plant, played a critical role in the restructuring process to ensure that
27
28  5

Civil No. 08-1014 (GAG/JA)

all intervention to manufacturing and packaging equipment, as well as work/repair orders, were properly documented.  Baerga had vast experience in the CMMS and documentation areas.  As part of the restructuring process, a lack of skills in the use of CMMS was identified on the shop floor during the second and third shifts.  Baerga was assigned to the second shift because he had the necessary skills to provide training and coaching to the shop floor in the effective use of the CMMS. Baerga had more knowledge of the CMMS than Miguel Alvarado.  When Baerga was assigned to work on the second shift Alvarado was also working on that shift; he was later transferred to the Packaging Department.  Baerga worked on the second shift from September 25, 2006 to May 2007. He currently works on the first shift.   Antonio Otaño, Wyeth's Executive Director of Site Infrastructure & Development, made the decision to transfer Baerga back to the first shift effective May 2007.  When Baerga returned from his military leave in September 2006, he was reinstated to his same position, but performing different duties.  His salary had also been increased.

Baerga never received a poor performance evaluation while Torres was the Director of the Maintenance Department.  Baerga's performance evaluation for the period from October 2000 to September 2001 was rated as 3, which stands for solid performer.  He was not evaluated during the 2002-2003 period because he was on military leave at Guantanamo.  In 2007, during the "Mid-Year Performance Feedback" prepared by Rene Irrizarry, Baerga was advised of his need to improve preventive maintenance and work order documentation errors, complete work orders on time, improve communication within the utilities and maintenance cells, improve planning and execution, and that he needed to take ownership of commitments.  Baerga agreed with this written feedback. In his performance evaluation for 2007, Baerga was again rated as a solid performer.  This evaluation was prepared by Torres.  Baerga signed this evaluation and wrote on it that he "generally agree[d] with the evaluation" and he also admitted that he "kept the same position and general supervisor duties."

All employees who receive an overall ranking of 2 or below in their performance evaluation are put under the "Performance Improvement Plan" ("PIP").  Baerga has never been under Wyeth's

6

**Civil No. 08-1014 (GAG/JA)**

PIP. Baerga understands that Torres gave him a rating of 3 instead of 2 and, thus, did not place him under the PIP because he was previously under military leave and because he had complained. However, Torres placed several employees under the PIP because of poor performance.  These supervisors are Ramon Solivan, Alvarado, Jose Gonzalez, and Ismael Rivera.  None of them are members of the armed forces and Solivan, Alvarado, and Rivera are above 40 years of age, while Gonzalez is under 40 years of age.  Every year, Baerga has received salary increases.  Prior to September 2005, Baerga never complained of discrimination at Wyeth nor about harassment. Baerga has been an employee of Wyeth during various employment reductions, nonetheless, he is still an employee there.

Prior to Baerga's military duty in Kosovo, which started on September 18, 2005, Baerga had not realized that he was allegedly being a victim of military discrimination.  When specifically asked the facts on which he supports his allegation that Wyeth discriminated against him due to his military status, Baerga identified the following: (1) he was assigned to a second shift after his return from military leave in 2006; (2) co-employees asked him "what he was doing there?" (referring to his assignments while on active military duty); (3) that before leaving the company Torres told him that it was not personal and that he was forced to make his life impossible to discharge him for being in the military and because they were taking out the old people from the company to clean the house; and (4) that some people made comments.

Baerga does not know if other employees that were not members of the military were transferred to the second shift as well, and he admitted that there were employees under and above 40 years old that were also transferred to the second shift.  Otaño never instructed Torres to discriminate against Baerga or to make his life impossible.  When Baerga was assigned to the second shift, he started supervising mechanics.  Prior to then, he had not supervised mechanics.  He only administered the SAP system.  Baerga alleges that he informed Wyeth that he could not work in the second shift because his wife, co-plaintiff Carmen N. Mercado, was suffering from a severe depression and that he had to take care of her.  However, on September 25, 2006, when he returned

**Civil No. 08-1014 (GAG/JA)**

1  to work from his military leave, Mercado was no longer under psychiatric treatment.  Furthermore,

2  Baerga never provided a medical certificate supportive of the fact that he needed to work on the first

3  shift because of Mercado's alleged psychiatric condition.

4        While Baerga worked in the second shift he barely had contact with Torres or Rene Irizarry.

5  He alleges, nonetheless, that Torres and Irizarry called him "seargent," "soldier," and "Rambo."

6  However, he never specifically complained of such comments at Wyeth, the Veteran Employment

7  Training Services of the Department of Labor ("VETS"), nor in the Equal Employment Opportunity

8  Commission ("EEOC").

9        Baerga alleges that one of the discriminatory actions against him was that when he returned

10  from military leave in September 2006, the office that was previously assigned to him was occupied

11  by Jose Moreno and that he was left without an office.  All his belongings were allegedly put inside

12  boxes and placed on a pallet at the stockroom and later he was asked to take them out of the storage

13  because they were obstructing.  As part of the reorganization, Moreno was transferred to Baerga's

14  office because Alvarado was assigned to occupy Moreno's.  Moreno was later transferred once more

15  because Andrew Espejo was assigned to Baerga's former office.  At his deposition, Baerga was

16  specifically asked on several occasions if he knew the business reasons why he was moved from his

17  original office to another, but he kept avoiding the answer or giving contradictory ones.  He also

18  admitted that he did not know the reasons why Alvarado was assigned to Moreno's office.  Alvarado

19  is over 40 years old and is a member of the military forces.  Moreno, who was initially assigned to

20  Baerga's former office, is older than Baerga and is not a member of the military forces.  Baerga does

21  not recall if he left things at his former office in boxes that he prepared.

22        When he returned to find Moreno in his former office, Baerga was assigned to share an office

23  with Solivan, who held a same level position as Baerga.  Baerga was upset that upon his return from

24  military leave he did not have a computer, a desk, and a chair specifically assigned to him.  Solivan

25  was assigned to work in the first shift and Baerga was assigned to work in the second shift.

26  Although they were in different shifts, according to Baerga, there was an overlap of around two and

27

28                                                 8

Civil No. 08-1014 (GAG/JA)

1   a half hours in which the two of them had to use the same computer.  Baerga testified that this

2   situation lasted only around two to three months.  Solivan and Baerga were in charge of the

3   "Machine Shop."  The "Machine Shop" was next to Solivan's and Baerga's office and farther away

4   from Baerga's former office.  Solivan is older than Baerga.  The office that is being shared by Baerga

5   and Solivan was properly the "Maintenance Office."  It is currently being shared by Baerga and two

6   more individuals who also have supervisory tasks in the Maintenance Department.  These other two

7   individuals are Carlos Arocho and Hector Flores, who are both younger than 40 and not members

8   of the military.

9        Baerga has testified that he complained about Solivan being his supervisor and, as a result,

10  Irizarry was assigned to directly supervise him.  Solivan was only Baerga's supervisor from his

11  return from military leave in September 2006 until October 11, 2006.  Baerga cannot say whether

12  Solivan discriminated against him.  Furthermore, Baerga does not know who made the decision of

13  assigning Solivan as his supervisor.

14        Baerga has participated in several training sessions at Wyeth.  In fact, he admitted having

15  taken 1,222 courses that were listed in his "Employee Training History."  When Baerga alleges in

16  his complaint that he had not received any training, Baerga is only referring to an allegation that he

17  had not taken technical training to make decisions when a problem arose related to electricity, air

18  conditioning, or "torneros."  That is, he alleges that he does not have any technical training to

19  supervise refrigeration technicians, mechanics, electricians, instrument workers, and "torneros."

20  However, his performance evaluations have not been affected by this and he continues to receive a

21  rating of 3.  Arocho, like Baerga, did not have any technical training to supervise refrigeration

22  technicians, mechanics, electricians, instrument workers, and "torneros."   In fact, his prior

23  experience was in manufacturing and not in maintenance and utilities.  It is the responsibility of each

24  individual supervisor to identify any training that he might personally need.  He then has to bring

25  to his own supervisor's attention which training, if any, he requires.  Wyeth promotes that its

26  supervisors be trained and it is customary to approve such courses.  Baerga does not know if there

27

28                                              9

Civil No. 08-1014 (GAG/JA)

1   are other supervisors without technical knowledge supervising other employees.

2        Baerga alleges in his deposition that Irizarry performs his prior tasks.  However, the sole task

3   of administering the maintenance system (SAP system) was only one of the many tasks and duties

4   that Irizarry was in charge of as "Manager - Plant Engineering/Maintenance."  For example, Irizarry

5   was also in charge of implementing the "Project Excellence Program" in the maintenance area

6   throughout the whole plant, the new calibration system, and the projects directed at reducing the

7   consumption of energy at the plant.  He also had to supervise maintenance supervisors.  Baerga

8   alleges that Wyeth assigned plaintiff's position to a younger employee with less experience and

9   seniority than him.  The younger employee he was referring to in his complaint is Irizarry.  Irizarry

10  was born on September 21, 1957, making him older than Baerga.  Baerga also alleged that Irizarry

11  had less experience and seniority in Baerga's position simply because Irizarry started working for

12  Wyeth after Berga.  He later clarified that he meant that Irizarry had less experience than him in

13  administering the SAP system.  Nonetheless, Irizarry has experience from his previous jobs in

14  maintenance systems.  Furthermore, Baerga had never seen Irizarry's resume nor had he worked with

15  him prior to Wyeth.

16       Irizarry started working for Wyeth on November 4, 2005, while Baerga was on military

17  leave.  Irizarry's position was that of "Manager - Plant Engineering/Maintenance."  He was recruited

18  to replace Baerga's prior supervisor, Jose Isern, and to take an active role in the implementation of

19  "Project Excellence" and the restructuring of the maintenance area.  At that time, Baerga continued

20  holding the same position of supervisor.  After Irizarry started working at Wyeth, a change in the

21  tasks and responsibilities of all the employees in the Engineering and Maintenance Department took

22  place.  In fact, more than one reorganization has taken place at Wyeth, including the Maintenance

23  area, since 2004.  Currently Wyeth is undergoing another reorganization.

24       Irizarry was a cadet with the U.S. Army and Air Force R.O.T.C.  When Irizarry started

25  working for Wyeth in November 2005 he supervised Alvarado, Solivan, and Rivera, who were all

26  supervisors with grade levels equal to or greater than Baerga.  Therefore, Baerga had never

27

28                                          10

Civil No. 08-1014 (GAG/JA)

1   supervised any of them.  Irizarry was also in charge of supervising one of the "Planners."  Baerga

2   does not know who made the decision to allegedly assign Irizarry the duties that Baerga performed

3   prior to his military leave that started on September 18, 2005.

4          Right after Baerga's return from military leave in September 25, 2006, he applied for a "Site

5   Services Leader" position.  This position was posted from September 27-29, 2006.  Thus, at that

6   moment Baerga had only been working for two days in the second shift.  Baerga was interviewed

7   for this position by Edwin Albertorio.  He found out that he was not selected for the position a short

8   time after his interview, when the new recruit was introduced to the employees.  He alleges that

9   Albertorio participated in the decision to hire Aponte but he does not know if someone else was

10  involved in the decision-making process.  The employee selected for the position was Jose Aponte-

11  Rivera.  Baerga does not know Aponte's academic background, prior experience, or if he is a

12  member of the military forces.  He was recruited externally.  Baerga does not know Aponte's salary

13  prior to his recruitment at Wyeth.  Albertorio had interviewed Baerga as well as other candidates for

14  the position.  However, Aponte was recruited because he had a strong background and experience

15  on mechanical areas, capital projects, computer software knowledge, and demonstrated great

16  leadership skills to deal with over 300 independent contractors and 12 subordinates.  Torres and

17  Irizarry had nothing to do with the decision to hire Aponte.

18         At the Security Unit under Albertorio's supervision, 4 out of the 11 employees are currently

19  members of the armed forces.  In fact, Jorge Rivera, the manager who is second in command to

20  Albertorio, is also a member of the military forces.  The majority of the employees under

21  Albertorio's supervision are above 40 years of age.

22         In January 2007, Baerga applied for a position of "Maintenance Supervisor" at Wyeth's

23  Consumer plant.  That plant is a different and independent operation.  Irizarry recommended Baerga

24  favorably for this position.  Baerga does not know if someone was recruited at that time for the

25  position, but he knows that there is someone currently on that position.  Baerga does no know if that

26  person is over 40 years old or if he is a member of the armed forces.  Other than the "Site Services

27

28                                                     11

Civil No. 08-1014 (GAG/JA)

1  Leader" and "Maintenance Supervisor" positions, Baerga has not applied to any other position.

2        Baerga alleges that, when he returned from military leave in 2006, his tasks were increased

3  and that he had double the amount of work as others.  For example, Baerga alleges that he, as a

4  supervisor, now has to enter work orders to the system, which is a clerical task.  However, the rest

5  of the supervisors also have to enter worker orders to the system.  Baerga also claims that he was

6  supervising 10 employees, but that when he was transferred back to the first shift he had to supervise

7  4 employees.  However, before going on his military leave to Kosovo, he supervised 7 employees

8  and, at times, he had also supervised more than 10 employees.  In fact, after his return from work

9  from his military leave from Kosovo in 2006, Solivan, as well as the other supervisors, were

10  supervising more employees than Baerga.

11        Currently, Baerga and Arocho are supervisors in the first shift and Flores is a supervisor in

12  the second shift.  Flores and Arocho perform basically the same tasks as Baerga, but in different

13  areas.  They all report to the same manager, Samuel Lopez.  In April 2008, after Solivan's

14  retirement, Arocho started working as a supervisor in the first shift with Baerga.  Arocho had 7

15  employees under his supervision and Baerga had 9.  On April 28, 2008, Baerga requested that a

16  mechanic under Arocho's supervision be transferred to his group.  The request was granted as

17  requested. As a result, Arocho had 6 employees under his supervision while Baerga had 10.  Later

18  on, a mechanic under Arocho's supervision resigned, thus, he ended up supervising 5 employees.

19  The result of that is that Arocho has to do the same amount of work with less employees while

20  Baerga had more employees available under his supervision to complete the tasks assigned to him.

21  In the  meantime, Flores supervised 9 employees in the second and third shifts.  As a result of the

22  reduction in force that took place at Wyeth in December 2008, another reorganization took place in

23  the Maintenance area.  As such, effective January 26, 2009, Arocho is supervising 8 employees

24  while Baerga is supervising 7 employees.  Flores is currently supervising 7 employees.

25        Baerga claims that he also has to perform tasks that correspond to the "Planner."  However,

26  he also admitted that the rest of the supervisors also have to perform these tasks.  This is the result

27

28                                                     12

1   of the elimination of the "Planner" position.  However, as of the day of the deposition, there is one

2   "Planner" working at Wyeth.  Baerga thinks that the amount of work for the "Planner" is too much

3   and that is why they end up doing those tasks.  Baerga also claims that he had to perform tasks that

4   corresponded to the "Reliability Engineer."  According to Baerga, other supervisors also have to

5   perform tasks of the "Reliability Engineer," although not with the same frequency.  However, he

6   does not know if there are other supervisors performing fewer tasks that correspond to the

7   "Reliability Engineer" but more tasks that correspond to the "Planner."

8       Baerga alleges that Lopez, Arocho, Gonzalez, and Otaño have called him old.  When asked

9   about the frequency in which these comments were made, Baerga answered that they were constant

10  in 2007, but have decreased after the complaint was filed in 2008.  Lopez started working at Wyeth

11  on January 14, 2008, after the instant complaint was filed.  On March 1, 2008, he started to supervise

12  Baerga as part of a reorganization in the maintenance area.  Arocho did not have any interaction

13  whatsoever with Baerga prior to April 2008, months after the instant complaint was filed.  In fact,

14  he worked in the Manufacturing Department, not the Maintenance Department.  Otaño does not have

15  frequent contact with Baerga.  In fact, Otaño's office is in the Administration Building, which is

16  separate from the building where Baerga's office is located.  Baerga allegedly complained about

17  these comments to Lopez and Otaño, as well as to Judith Ferrer, Senior Human Resources

18  Consultant, and Ricardo Zayas, Vice-President and Managing Director.  Baerga does not know when

19  he complained to Otaño, but presumably at some point in 2007.  However, Otaño has stated that

20  Baerga went once to his office, either in late 2006 or early 2007, to ask for his intervention in order

21  to move him to the first shift.  He said that his wife had a medical condition.  He did not complain

22  of any comment whatsoever and did not mention that he felt discriminated because of his age.  Since

23  then, he has not complained to Otaño about any incident or situation whatsoever.  Otaño is older

24  than Baerga.  Arocho and Gonzalez hold similar positions as Baerga; they do not supervise him.

25      Baerga's allegations of harassment due to his age and military status are based on the

26  incidents mentioned above.  On October 31, 2006, Baerga filed a discrimination charge before the

27

28                                              13

**Civil No. 08-1014 (GAG/JA)**

VETS.  Baerga had the opportunity to explain in VETS his version of the case.  Through a letter dated January 22, 2007, VETS informed Baerga that it had concluded the investigation against Wyeth and that the facts alleged did not fall under the USERRA statute.  Baerga acknowledged receipt of this letter.  On September 21, 2007, Baerga filed a discrimination charge before the EEOC. He brought the same allegations already presented to VETS, but now claiming age-based discrimination and retaliation.  All of the incidents mentioned in paragraphs b, d, e, f, g, h, and i of the "Sworn Statement" included as part of Baerga's EEOC discrimination charge took place on or before his return to work in September 2006.  By then he understood that the actions were discriminatory.

On January 4, 2008, Baerga filed the instant complaint.  Baerga admitted that as a result of having filed a discrimination charge before the EEOC and having filed the instant case, the comments made to him had reduced and Wyeth had done nothing concrete against him.  According to her testimony during deposition, co-plaintiff Mercado alleges to have known that Baerga was a victim of age discrimination at least since the date he complained at VETS (October 31, 2006). Moreover, she admitted that she knew for sure about his age and military discrimination a short time after his return to work (approximately 1 to 2 months after his return).  Mercado also testified that, since the beginning, Baerga told her that his change in shift and duties was due to age discrimination. In fact, she understands that he felt discriminated because of his age since his return to work.

**III.     Analysis**

**A.     USERRA**

*(i)     Discrimination Claim*

USERRA prohibits adverse employment actions in which the employee's membership in the uniformed services is a motivating factor in the employer's action. <u>Ortiz Molina v. Rimco, Inc.</u>, 2006 WL 2639297, *3 (D.P.R. 2006) (citing <u>Figueroa Reyes v. Hosp. San Pablo del Este</u>, 389 F. Supp. 2d 205, 211 (D.P.R. 2005)).  Plaintiff alleges that, after he returned from military duty in September 2006, Wyeth violated USERRA by drastically changing his functions and duties.  Baerga alleges that

14

Civil No. 08-1014 (GAG/JA)

1   this constituted a demotion because he was given different work and a higher amount of it.

2   Furthermore, Baerga alleges that being assigned to the second shift, instead of the first one, also

3   constituted an adverse employment action based on his military status.  Plaintiff also alleges that his

4   office had been occupied by another person, that his files were stored in carton boxes and he had no

5   computer or phone, and that he had applied for the "Site Services Leader" position and the

6   "Maintenance Supervisor" position and he did not get either of them.  For a plaintiff to establish a

7   prima facie case of employment discrimination under USERRA he must show that his membership

8   or participation in the uniformed services was the substantial or motivating factor behind the

9   employer's adverse employment action.  Ortiz Molina, 2006 WL 2639297 at *3.  An employer may

10  escape liability by raising the affirmative defense that it would have made the same decision

11  regardless of the employee's veteran status.  Id.

12         These alleged actions taken by Wyeth might constitute adverse employment actions.  See

13  Carlson v. N.H. Dep't of Safety, 609 F.2d 1024, 1027 (1st Cir. 1979) (finding that a shift

14  reassignment requiring weekend work, night work, and longer hours constituted an employment

15  action that might deter an employee from participating in the military reserves); Hill v. Michelin N.

16  Am., Inc., 252 F.3d 307, 313 (4th Cir. 2001) (finding that a regular schedule is "properly viewed as

17  an advantage of the job under USERRA's definition of 'benefit of employment.'"); Allen v. United

18  States Postal Serv., 142 F.3d 1444, 1447 (Fed. Cir. 1998) (concluding that a position's "desirable"

19  schedule with regular daytime hours "is an 'incident or advantage of employment'"); Blackie v.

20  Maine, 75 F.3d 716, 725 (1st Cir. 1996)(holding that an adverse employment action typically

21  requires the employer to (1) take something of consequence from the employee, say, by discharging

22  or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold

23  form the employee an accouterment of the employment relationship, say, by failing to follow a

24  customary practice of considering her for promotion after a particular period of service).

25         Having proven that prong of the test, plaintiff has to demonstrate that the adverse

26  employment actions were taken because of his military status.  Proof of a relationship between the

27

28                                         15

Civil No. 08-1014 (GAG/JA)

adverse employment actions and the plaintiff's military status can be inferred from the temporal proximity between the adverse employment action and the employee's return from a military leave. See Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 19 (1st Cir. 2007); see also Ortiz Molina, 2006 WL 2639297 at *3.  However, this, in and of itself, is not enough to prove that the adverse employment actions were motivated by plaintiff's military status.  Furthermore, the evidence shows that other employees who were members of the armed forces, as well as employees who were not, had been treated the same way.

Even if, *arguendo*, the court finds that the adverse employment actions were due to plaintiff's military status and therefore that the plaintiff has proven his prima facie case, the defendant has proven its affirmative defense by a preponderance of the evidence, to wit, that Wyeth would have taken those same actions regardless of the plaintiff's veteran status.  The record is replete with uncontested evidence showing that Wyeth was undergoing a reorganization and that the actions that they took were in order to create efficiency and were in no way meant to discriminate against veterans.  For these reasons, the court **GRANTS** defendant's motion for summary judgment as to the USERRA discrimination claim.

### (ii)    *Retaliation Claim*

USERRA states that "[a]n employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter.  The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services." 38 U.S.C. § 4311(b).  Therefore, in order for a plaintiff to prove a claim of retaliation he must show: (1) that he engaged in protected activity; (2) that the employer took an adverse employment action against him; and (3) that the employee's protected activity was a motivating factor in the employer's action.  See Francis v. Booz,

16

**Civil No. 08-1014 (GAG/JA)**

Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006).

Plaintiff engaged in protected activity by complaining to VETS and the EEOC about the allegedly discriminatory behavior by Wyeth, thus, meeting the first prong of the prima facie case of retaliation. To meet the second prong of the test the plaintiff relies on the previously mentioned adverse employment actions by Wyeth. The court has already found that this type of behavior could constitute adverse employment actions sufficient to prove a prima facie case of discrimination under USERRA. Therefore, the second prong of the prima facie case of retaliation is met. Finally, as previously stated, proof of a relationship between the adverse employment actions and the plaintiff's protected conduct can be inferred from the temporal proximity between the adverse employment action and the employee's return from a military leave. See Velazquez-Garcia, 473 F.3d at 19; see also Ortiz Molina, 2006 WL 2639297 at *3. Assuming, *arguendo*, that the allegedly adverse employment actions taken by Wyeth were taken because of plaintiff's protected activity, the plaintiff would satisfy the prima facie case of retaliation. However, if defendant can prove by a preponderance of the evidence that it would have taken those actions even if Baerga had not complained, then summary judgment would be appropriate. Ortiz Molina, 2006 WL 2639297 at *3. The record is replete with uncontroverted evidence showing that Wyeth was undergoing a reorganization and that the actions that it took were in order to create efficiency and were in no way meant to discriminate against veterans. For these reasons, the court **GRANTS** defendant's motion for summary judgment as to the USERRA retaliation claim.

> ***(iii)    Harassment Claim***

Plaintiff finally claims that he was subjected to a hostile work environment after he returned from his military leave in 2006. "USERRA prohibits the denial of any benefit of employment by an employer to members of the uniformed service based on their membership and/or performance of service, but does not specifically prohibit an employer from subjecting an employee to harassment or a hostile work environment due to the employee's military status." Ortiz Molina, 2006 WL 2639297, *5 (internal citations omitted); see also Figueroa Reyes, 389 F. Supp. 2d at 212.

**Civil No. 08-1014 (GAG/JA)**

Therefore, plaintiff's claim of harassment in the form of a hostile work environment is not cognizable under USERRA.  For that reason, the court **GRANTS** defendant's motion for summary judgment as to the USERRA hostile work environment claim.

      **B.**     **ADEA**

      *(i)*     ***Discrimination Claim***

The ADEA requires a plaintiff to file a discrimination charge with the EEOC within 300 days of when the allegedly unlawful practice took place.  29 U.S.C. § 626(d).  If this charge is not filed within 300 days, then the plaintiff's cause of action is time-barred.  Id.  The 300 days begin to run when the employer's decision is made and has been communicated to the affected employee.  Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 750 (1st Cir. 1994).  Baerga admitted in his deposition that most of the adverse employment actions which he alleged in his EEOC complaint took place on or before his return from military leave in September 25, 2006.  The only alleged adverse employment action that took place after his return was that he applied for two positions, "Site Services Leader" and "Maintenance Supervisor," and he was not assigned to any of them.  Plaintiff applied for the "Site Services Leader" position on or around September 27-29, 2006.  He found out that he had not been selected for the position a short time after this.  He applied to the "Maintenance Supervisor" position in January 2007.  If the court were to give the benefit of the doubt to the plaintiff and find that the alleged adverse employment actions took place on or about the date when plaintiff returned to work in late September 2006, plaintiff would have had until late July or early August 2007 to file his EEOC charge in order for it to be timely.  Plaintiff's EEOC charge was clearly filed after July/August 2007.  The only adverse employment action which would not be time-barred would be the failure to be considered for the "Maintenance Supervisor" position for which he allegedly applied in January 2007.  Plaintiff would have had until November 2007 to file an EEOC charge related to that adverse employment action.  Given that he filed the EEOC before November 2007, the ADEA claim is not time-barred as to that particular adverse employment action.

**Civil No. 08-1014 (GAG/JA)**

In order to prove a prima facie case of age-based discrimination and, thus, survive summary judgment, plaintiff has to demonstrate by a preponderance of the evidence that he: (1) was at least 40 years of age; (2) met the employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) the employer did not treat age neutrally.  Rivera Aponte v. Restaurant Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003).  If the court were to assume that plaintiff has met the first three prongs, he, nonetheless, fails to prove the fourth one.  Plaintiff alleges that he knows that there is someone currently assigned to  that position but he does not know if that person is over or under 40 years of age.  This is clearly not enough to create a genuine issue of material fact as to proof that age was not treated neutrally by the employer in making its decision not to hire plaintiff for the position of "Maintenance Supervisor."  For the abovementioned reasons, the court **GRANTS** defendant's motion for summary judgment as to the age-based discrimination claim.

### (ii)    *Retaliation Claim*

In order to establish a prima facie case of retaliation under the ADEA, plaintiff must demonstrate that he (1) engaged in activity protected under the ADEA; (2) suffered an adverse employment action; and (3) that a causal connection existed between his protected conduct and the adverse employment action.   Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991). Defendant concedes that plaintiff has met the first prong, to wit, that he engaged in protected conduct by filing a charge with the EEOC.  However, the defendant contends that plaintiff has not met prongs 2 and 3 insofar as all the complained-of adverse employment actions took place before the filing of the EEOC charge in late 2007.  It is clear that if the alleged adverse employment actions took place before the filing of the EEOC charge, they cannot be causally related to the filing of the EEOC charge.  As such, this court finds that plaintiff has not met his burden of establishing a prima facie case of retaliation under the ADEA.  For that reason, the court **GRANTS** defendant's motion for summary judgment.

### (iii)    *Harassment Claim*

To prove a prima facie case of harassment based on age, plaintiff must show that: (1) he is

Civil No. 08-1014 (GAG/JA)

a member of the protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based upon age; (4) the harassment was severe or pervasive enough to alter the conditions of his employment and create an abusive work environment; (5) the objectionable conduct was both objectively and subjectively offensive; and (6) some basis for employer liability exists. Rivera v. Frito Lay, 265 F.3d 15, 23-24 (1st Cir. 2001). The court understands that plaintiff's worst hurdle comes when trying to prove prong 4. Even taking the evidence in the light most favorable to the plaintiff, the court cannot find that the behavior which allegedly constitutes a hostile work environment is sufficiently severe or pervasive to alter the condition of plaintiff's employment and create an abusive work environment. Given that plaintiff has not come forward with evidence to sustain his prima facie case of age-based harassment, the court **GRANTS** defendant's motion for summary judgment.

### C.    Supplemental State Law Claims

Plaintiff has also brought an action under Law 100 and Law 115. Firstly, the First Circuit has held that "on the merits, age discrimination claims asserted under the ADEA and under Law 100 are coterminous." Davila v. Corp. De P.R. Para La Difusion Publica, 498 F.3d 9, 18 (1st Cir. 2007). Therefore, given that plaintiff adduced no significantly probative evidence in order to prove his age-based discrimination claim under the ADEA, it is appropriate for this court to dismiss plaintiff's Law 100 claim on the merits. For that reason, this court **GRANTS** summary judgment as to the age-based discrimination claim under Law 100.

As to Law 115, this court has previously held that ADEA and Law 115 retaliation claims are similar and have parallel evidentiary mechanisms. See Sanchez Borgos v. Venegas Const. Corp., 2009 WL 928717, *6-7 (D.P.R. 2009). Therefore, given that plaintiff adduced no significantly probative evidence in order to prove his retaliation claim under the ADEA, it is appropriate for this court to dismiss plaintiff's Law 115 claim on the merits. For that reason, this court **GRANTS** summary judgment as to the retaliation claim under Law 115.

Civil No. 08-1014 (GAG/JA)

### D.      Article 1802

Co-plaintiff Mercado alleges that she has suffered emotional damages, pursuant to Article 1802 of the Puerto Rico Civil Code, as a result of the alleged discriminatory acts of Wyeth against Baerga.  The statute of limitations for an action under Article 1802 is one year.  P.R. Laws Ann., tit. 31, § 5298.  This period begins to run when the aggrieved person knew or should have known of the injury.  Id.  The evidence shows that Mercado knew or had reason to know of the alleged discrimination at least since the date that he complained to VETS, that is, on October 31, 2006.  Even if the court were to assume that she did not know about this complaint, she admitted that she knew about the discrimination approximately 1 to 2 months after Baerga's return to work on September 25, 2006.  Therefore, an action under Article 1802 would only have been timely if it had been brought in October or November 2007, within one year of Mercado's knowledge of the discrimination.  Given that this case was brought in 2008, the claim under Article 1802 is time-barred.  Finally, the limitations period for this action had not been tolled.  It is well-settled law that the filing of an administrative charge will not toll the running of the statute of limitations for tort actions provided that an administrative agency, such as the EEOC, does not possess jurisdiction over such controversies.  Sanchez Ramos v. P.R. Police Dep't, 392 F. Supp. 2d 167, 181 (D.P.R. 2005); Matos Ortiz v. Commonwealth of Puerto Rico, 103 F. Supp. 2d 59, 63-63 (D.P.R. 2000).  For the aforementioned reasons, the court **GRANTS** defendant's motion for summary judgment as to Mercado's claim for damages under Article 1802.

### IV.      Conclusion

For the abovementioned reasons, the court **GRANTS** defendants' motion for summary judgment (Docket No. 35) in its entirety.  Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico this 3rd day of September 2009.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPI
United States District Judge

21

**Civil No. 08-1014 (GAG/JA)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28